STATE OF NEBRASKA, APPELLEE, v. JOHN B. GERBER, APPELLANT.

291 N. W. 2d 403

Filed April 15, 1980. No. 42816.

Friedman Law Offices, for appellant.

Paul L. Douglas, Attorney General, and Terry R. Schaaf, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

KRIVOSHA, C. J.

The appellant, John B. Gerber (Gerber), was convicted in the municipal court of the city of Lincoln, Nebraska, of the offense of operating a motor vehicle while having ten-hundredths of one percent or more by weight of alcohol in his body fluid as shown by chemical analysis of his blood, breath, or urine, contrary to Neb. Rev. Stat. § 39-669.07 (Reissue 1978). Gerber appealed the conviction to the District Court for Lancaster County, Nebraska, which affirmed the judgment of the municipal court. Thereafter, he perfected his appeal to this court. For reasons more particularly set out in this opinion, we reverse and dismiss the complaint.

The evidence reflects that shortly after midnight on October 21, 1978, a vehicle driven by Gerber was observed by a member of the Lancaster County sheriff's department, Gary Rikli (Rikli), as it passed through a mobile radar clock in excess of the lawful speed. Rikli proceeded to follow Gerber's vehicle and observed it to cross the centerline, go back into the right lane, and then partially leave the roadway and pull back into the lane again. Rikli turned on his red light and started pursuing Gerber's vehicle. When the vehicle did not stop, Rikli activated his

siren, at which time the vehicle slowed and pulled over to the side of the road. When Rikli approached the vehicle, he observed that Gerber was behind the wheel and that there were three other persons in the vehicle. Upon arriving at the vehicle, Rikli detected the odor of alcohol. He asked Gerber to accompany him back to his police cruiser where he again detected a strong odor of alcohol.

After Rikli read to Gerber a statement concerning an alcohol pretest, Gerber agreed to take the pretest. The evidence discloses that the pretest, known as an "Alco-sensor," is a preliminary test made on the breath of an individual to determine the level of alcohol content. The device takes into itself 1 cubic centimeter of the subject's breath and analyzes it for alcohol content. The result of the analysis is displayed on a readout which is a part of the device. There are three possible readouts: "pass," "fail," or "1." The test performed on Gerber indicated "fail." At that point, Rikli placed Gerber under arrest and transported him to the Lincoln police department.

Upon arrival at the Lincoln police department, Rikli turned Gerber over to an officer of the Lincoln police department, Officer Edward Sexton (Sexton), who was in charge of administering breath tests by the use of a gas chromatograph intoximeter (a "Breathalyzer"). Gerber was asked whether he would submit to such a test and, upon his agreeing to do so, the test was administered. On the basis of the test results, Gerber was charged with a violation of § 39-669.07 and he was brought before the municipal court of the city of Lincoln (trial court) the following morning for arraignment. At the time of the arraignment, he appeared with his lawyer, entered a plea of not guilty to the charge, and orally requested, through his attorney, that he be granted a jury trial. The evidence reflects that the request was denied because it was not in compliance with the rules of

practice previously promulgated by the trial court, in particular Rule XII(c), which reads: "Parties desiring jury trials in criminal cases must request the same *in writing* at the time of arraignment or no later than 14 days prior to the time the case has initially been set for trial by the Court." (Emphasis supplied.) Thereafter, on November 16, 1978, Gerber's counsel filed a written request for jury trial. However, the case had already been set for November 29, 1978, and therefore the trial court denied the request because it was not within time as prescribed by Rule XII(c). On November 28, 1978, the matter was continued until December 20, 1978, whereupon trial was had to the trial court.

Rikli appeared and testified concerning his observance of Gerber on the night in question and the administration of the preliminary test. Counsel for Gerber objected to any testimony concerning the pretest on the grounds that there was not sufficient foundation offered. The objection was overruled.

Rikli then testified that he placed Gerber under arrest and brought him to the Lincoln police station.

Sexton was then called by the State and testified concerning how he administered the Breathalyzer test to Gerber. Gerber's counsel again objected on the basis that, as with the pretest, the results of the Breathalyzer were not admissible in evidence because of insufficient foundation. It is clear from the record that Gerber's objection was based upon the fact that Sexton was unable to testify whether the Breathalyzer was working properly when the test was administered.

Sexton then described how the test was administered. Specifically, he testified that the standard test procedure, which he had followed, requires one to wait for at least 15 minutes after the subject's last drink or smoke. The machine is then activated by switching it into the "operate" position. A steady green light comes on. At that time, the digital read-

ing is .000. The operator then opens a valve and purges the machine for 10 seconds. He then attaches to that valve an ampul containing a measured concentration of ethyl alcohol, referred to as a "NALCO standard." The concentration of ethyl alcohol is printed on the outside of the ampul. If the machine is operating correctly, it will produce a digital reading equal to the number placed on the outside of the ampul. In this way, the operator verifies that the machine is properly operating and is properly reporting alcohol content. After checking the machine with the NALCO standard, the operator clears the machine, attaches a clean mouthpiece, and requests the subject to blow into the mouthpiece as long as possible. The subject's breath is then analyzed by the machine and the digital readout is recorded.

Sexton testified that he had demonstrated this technique to the Nebraska Department of Health and had obtained a permit from them to perform the test. The State, over objection, offered the permit in evidence. The permit was a piece of paper issued by the Nebraska Department of Health authorizing Edward E. Sexton to perform determinations for body fluid alcohol content by use of an "Intoximeter G. C. (direct breath) 'Alert' and Alco-Sensor preliminary breath test." The permit was issued on October 24, 1977, and would expire on March 1, 1979. The permit bore the signatures of Henry D. Smith, Director of Health, and H. E. McConnell, Director of Laboratories. The trial court overruled the objection and received the permit in evidence. Sexton testified on direct examination that the result of the test on Gerber he had described was a reading of nineteen-hundredths of one percent alcohol by weight per unit volume of body fluid.

On cross-examination, Sexton conceded that determining whether the machine works depends upon whether the alcohol content of the NALCO standard

is, in fact, as reflected on the ampul. Sexton admitted, however, that he did not know who had prepared the NALCO standard, where it came from, nor its actual alcohol content. Moreover, he admitted that he did not know whether the machine was really functioning properly at the time he tested Gerber.

The State further offered in evidence, as an exhibit, Rule 3 promulgated by the Nebraska Department of Health on August 27, 1975. Rule 3 is entitled "Rules and Regulations Relating to Analysis for the Determination of Alcoholic Content of Body Fluids and of the Breath under the State Implied Consent Law." Although the heading of the rule implies that it pertains to rules and regulations relating to the analysis of alcohol content, in fact Rule 3 generally prescribes rules and regulations under which a permit is issued to an individual. Rule 3-(3) reads, in part, as follows: "(b) Permittee for the operation of devices for the analysis of breath for alcoholic content: i. Shall adhere strictly to the operation procedures set forth by the operating supervisor of the device for which he holds a permit." There was no evidence as to who was Sexton's operating supervisor nor the operation procedures set forth by such operating supervisor.

On the basis of Sexton's testimony as to the Breathalyzer reading, Gerber was adjudged guilty as charged.

Gerber has assigned several specific errors. They are: (1) The trial court erred in failing to grant Gerber a jury trial; (2) The trial court erred in receiving into evidence without sufficient foundation the results of the pretest device; (3) The trial court erred in receiving hearsay evidence regarding the alleged contents of the NALCO standard; and (4) The trial court erred in receiving into evidence without sufficient foundation the results of the Breathalyzer test.

We turn first to Gerber's contention that the trial court erred in refusing to grant him a jury trial. Our determination of that issue requires us to examine and balance Neb. Rev. Stat. § 24-536 (Reissue 1975), the statute then in effect, on the one hand and § 26-1,202 (Reissue 1975) on the other. Section 24-536 reads, in part, as follows:

> Either party to *any* case in county or municipal court, except criminal cases arising under city or village ordinances and traffic infractions, and except any matter arising under the provisions of the Nebraska Probate Code, may demand a trial by jury. In *civil* cases, the demand must be in writing and must be filed on or before answer day.

(Emphasis supplied.) (The 1979 amendment to § 24-536 is not relevant to this issue.) Section 26-1,202 provides: "The judges of the municipal court may promulgate rules of procedure and practice in said court, not in conflict with the laws governing such matters." It was pursuant to § 26-1,202 that the municipal court promulgated Rule XII, requiring that requests for a jury trial in a criminal case be in writing. We believe, however, that a reasonable reading of the two statutes compels us to find that a defendant in a criminal case should not be denied a jury trial because of a failure to file a written request at the time of arraignment when the defendant is present in person before the court and makes an oral request.

We have previously held that a violation of § 39-669.07 is either a misdemeanor or a felony and that a defendant charged under said section is entitled to a jury trial under the provisions of § 24-536. *State v. Karel*, 204 Neb. 573, 284 N.W.2d 12 (1979). We believe it significant that § 24-536 makes a distinction between criminal cases and civil cases. Section 24-536 specifically provides that "In *civil* cases, the demand must be in writing and must be filed on or be-

fore answer day." (Emphasis supplied.) It appears to us that, had the Legislature wished to require that a request for jury trial in a criminal case likewise be in writing, it would not have made any distinction. Having made such a distinction, a reasonable reading of the questioned statute must be to the effect that, in criminal cases, the demand need not be in writing. We believe that there exists a very valid reason for such a distinction. In civil cases, the defendant rarely, if ever, appears before the court prior to the actual trial. Virtually all of the defendant's contact with the court prior to trial is in writing. There would be virtually no time for the court to summon a jury in advance of trial if it did not become aware of the defendant's desire for a jury trial until the moment of trial. On the other hand, in a criminal case, it is rare, if ever, that the defendant does not personally appear for arraignment in advance of trial. Further, Rule XII of the Lincoln municipal court permits the defendant to request a jury at *the time of arraignment if in writing.* It seems strange indeed to permit the defendant to answer to the criminal charge by orally pleading not guilty and yet require that, at the same moment, he file a written request for a jury. As the court accepts the oral plea of not guilty, it can just as easily accept an oral request for a jury trial. To impose a requirement that the oral request be ignored and a document in writing be filed with the clerk of the court rather than with the judge imposes an unnecessary and improper requirement upon a defendant and is contrary to § 24-536.

We have previously held that a municipal court may establish reasonable rules for its own administration and we continue to adhere to that view. *Summit Fidelity and Surety Co. v. Nimtz,* 158 Neb. 762, 64 N.W.2d 803 (1954). Under the circumstances, however, we believe that a rule requiring a defendant who personally appears before the court

and enters an oral plea of not guilty to file a written request for a jury trial is unreasonable. The defendant should be permitted to either make the request orally when before the court *or* to file a written request a reasonable time in advance of trial.

We are not unmindful that our decision in *State v. Nielsen*, 199 Neb. 597, 260 N.W.2d 321 (1977), may appear to the contrary. To the extent that it is in conflict with our decision herein, it is specifically overruled. The trial court was in error in refusing Gerber's request for a jury trial.

We turn now to Gerber's additional assignments of error, the first of which was that the trial court erred in receiving in evidence the results of the Alco-sensor preliminary breath test that Rikli administered to Gerber. Gerber's objection is based upon the provisions of Neb. Rev. Stat. § 39-669.11 (Reissue 1978), which provides as follows:

Any test made under the provisions of section 39-669.08, if made in conformity with the requirements of this section, shall be competent evidence in any prosecution under a state statute or city or village ordinance involving operating a motor vehicle while under the influence of alcoholic liquor, or involving driving or being in actual physical control of a motor vehicle with an amount of alcohol in the blood in violation of a statute or a city or village ordinance. Tests to be considered valid shall have been performed according to methods approved by the Department of Health and by an individual possessing a valid permit issued by such department for such purpose. The department is authorized to approve satisfactory techniques or methods and to ascertain the qualifications and competence of individuals to perform such tests and to issue permits which shall be subject to termination or revocation

at the discretion of the department.

The preliminary test is indeed a test made under the provisions of § 39-669.08. Section 39-669.08(3) reads as follows:

> Any law enforcement officer who has been duly authorized to make arrests for violation of traffic laws of this state or ordinances of any city or village may require any person who operates or has in his actual physical control a motor vehicle upon a public highway in this state to submit to a *preliminary test* of his breath for alcohol content if the officer has reasonable grounds to believe that such person has alcohol in his body, or has committed a moving traffic violation, or has been involved in a traffic accident. Any person who refuses to submit to such preliminary breath test or whose preliminary breath test results indicate an alcohol content of ten-hundredths of one per cent or more shall be placed under arrest. Any person who refuses to submit to such preliminary breath test shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not less than fifty dollars nor more than one hundred dollars.

(Emphasis supplied.) Therefore, before the results of the preliminary test could have been received in evidence, foundation evidence should have established that the requirements of § 39-669.11 had been met, including the requirement that the method of performing the preliminary test had been approved by the Nebraska Department of Health and that Rikli possessed a valid permit issued by the Department of Health for such purpose. Neither of these requirements was established by the evidence. The error, however, was not prejudicial to Gerber. It should be kept in mind that the testimony with regard to the preliminary test was offered not for the

purpose of establishing the charge against Gerber but rather to establish Rikli's justification for placing Gerber under arrest. There was ample evidence in addition to the preliminary test to justify the arrest, including speeding, erratic driving, and the strong odor of alcohol.

Specifically, in *State v. Orosco,* 199 Neb. 532, 260 N. W.2d 303 (1977), we held that the offering of a preliminary test of the breath under § 39-669.08(3) is not a condition precedent to an arrest for any offense arising out of acts alleged to have been committed while the person was driving or was in actual physical control of a motor vehicle while under the influence of alcoholic liquor. In so holding, we said: "The authority of the officer to make such arrest depends not upon the implied consent statute, but exists by virtue of the common law as codified in our statutes, to wit, sections 29-401 and 29-404.02, R. R. S. 1943." 199 Neb. at 540, 260 N.W.2d at 308.

Evidence regarding the preliminary test was offered solely to show the circumstances leading to the arrest which, in turn, required Gerber to submit to the Breathalyzer test or face the resulting consequences. In view of the fact that there was ample other evidence to justify the arrest, the receipt of the preliminary test in evidence was not prejudicial error and not grounds for reversal. *State v. Heiser,* 183 Neb. 665, 163 N.W.2d 582 (1968).

The remaining assignments of error with regard to the admission in evidence of the results of the Breathalyzer test present a more serious question and one which requires us to reverse and dismiss the complaint.

As we have indicated already, § 39-669.11 establishes two requirements that must be met in order for the results of a Breathalyzer test to be admissible in evidence. It must appear (1) That the test has been performed according to methods approved by the Department of Health and (2) That the test

was administered by an individual possessing a valid permit issued by the department for such purpose. The evidence in this case fails to establish that the test was administered according to methods approved by the Department of Health as that term must be understood.

Rule 3, in our view, does not constitute a list of "methods approved by the Department of Health" for the administration of a Breathalyzer test. Rule 3 generally describes how one may become eligible to obtain a permit and, at best, approves such methods as may be brought to the department from time to time, without indicating what those methods are. Nowhere in Rule 3 can one find either techniques or methods for administering a breath test. The only reference is found in Rule 3-(4), which reads as follows:

> An applicant for a permit shall, at the time of making application, state the identity of the method or methods he plans to use and, upon request, furnish details of technique or state where such details are readily available in scientific literature. Results obtained by the applicant in examination of check specimens shall be considered as partial evidence of the suitability of the method or methods for purposes of approval. The granting of a permit for performance of any specific test or technique shall be construed as Departmental approval of said test or method of analysis.

There is no evidence to indicate that any of these requirements were met by Sexton when obtaining his permit. Likewise, this rule appears somewhat in conflict with Rule 3-(3) concerning procedures established by an operating supervisor. Furthermore, neither a reading of Rule 3 nor an examination of the certificate issued to Sexton discloses what method is to be employed in making that test, though one can

determine the type of machinery which may be used. Simply typing on a paper that the operator is authorized to administer a test method known as the "Intoximeter G. C. (direct breath)" does not permit the trial court to know whether the test in fact has been administered by a method or technique approved by the Department of Health. Statutes such as the one in question, being criminal in nature and in derogation of the common law, must be strictly construed.

In *Otte v. State*, 172 Neb. 110, 108 N.W.2d 737 (1961), we held that a registered nurse who administered a blood test without being "under the direction of a physician" as required by statute was not in compliance with statutory requirements and the results of the test could not be admitted into evidence. In so holding we said:

> A statute providing that a presumption of intoxication arises under a determination that the amount of alcohol in the subject's body fluid at the time in question is 0.15 percent or more, by weight, as shown by chemical analysis, is in derogation of the common law and subject to strict construction.

*Id.* at 117, 108 N.W.2d at 741. We believe likewise that where the statute requires that the methods be approved by the Department of Health before the results of the test may be admitted in evidence, the techniques and methods must be set out and approved in sufficient detail that a trial court may determine if, in fact, the method has been followed. In *State v. Graham,* 360 So. 2d 853 (La. 1978), the Supreme Court of Louisiana was called upon to review a case similar to the case at bar under a statute almost identical with ours.

The Louisiana court said:

> The legislature and this Court have recognized the importance of establishing safeguards to guarantee accuracy in chemical

testing. . . . In considering previous attacks upon the validity of the statutory design, this Court has expressed the opinion that, in order for the State to avail itself of the statutory presumption of a defendant's intoxication without violation of his constitutional due process guarantee of a fair trial, detailed methods, procedures and techniques must be officially promulgated to insure the integrity and reliability of the chemical tests including provisions for "repair, maintenance, inspection, cleaning, *chemical accuracy, certification* [as well as] *proof of adherence to*" those methods, procedures and techniques.

*Id.* at 855 (emphasis in original).

In *State v. Jones,* 316 So. 2d 100, 103 (La. 1975), the case partially quoted in *Graham,* the Louisiana Supreme Court further said:

We therefore interpret [Louisiana's law relating to breath tests] to mean that before the test results can trigger the presumption of intoxication and thus relieve the State of its burden of proof, much more than the mere designation of the name of a testing device and vague reference to some procedure or technique, without setting forth the specifics of such procedure or technique . . . is necessary.

Such a requirement does not seem unreasonable where the State is permitted to make a prima facie case by merely introducing in evidence the results of a mechanical test. The State's failure to prove the specific steps approved by the Department of Health should have prevented the State from introducing the results of the test in evidence.

Further, we believe that the results of the test offered by Sexton were inadmissible because of a lack of adequate foundation. Sexton admitted that he had no way of knowing whether the Breathalyzer

was operating properly at the time the test was given. Courts which have been called upon to establish rules with regard to such Breathalyzer tests have held that, before the results of a Breathalyzer test for blood alcohol are admissible into evidence, a proper foundation must be laid for the admission of such evidence.

While we are not now called upon to decide the reliability of the Breathalyzer as a means of establishing the State's burden of proof in cases such as this, decisions from other jurisdictions as well as treatises on the subject lead us to believe that we should, at a minimum, require that whatever safeguards can reasonably be provided, should be provided.

In *State v. Jones, supra* at 103, it is noted:

> Even a casual examination of the voluminous literature dealing with chemical tests for intoxication, their reliability, their validity and their drawbacks, compels the conclusion that this entire aspect of the law relating to the significance of the objective effects of alcohol ingestion in criminal prosecutions related to vehicle operation is fraught with difficulty.

In Erwin, Defense of Drunk Driving Cases, Ch. 18 (3rd ed. 1979), a host of possible errors which can affect the results are noted, including differences in altitude; variations in blood-air ratios; variations in individual lung capacity and pulmonary functions; differences in the ratio between blood alcohol and breath alcohol; variations in the amount of carbon dioxide in the subject's alveolar air (air from the lungs) caused by acidosis or alkalosis, hyperventilation, apprehension, or stress; contamination of the breath; regurgitation or vomiting; other contaminants present in or about the mouth or lips; air pollution; or natural body gases. Any one or more of these factors can affect the Breathalyzer results and give an inaccurate reading.

It is not, therefore, unreasonable to require the testifying officer to establish where the NALCO standard came from, how it was received, under what conditions it was kept and preserved, and what spot checks were made to determine the validity of the NALCO standard.

In *State v. Baker,* 56 Wash. 2d 846, 854, 355 P.2d 806, 811 (1960), the Washington court reviewed how the calibration samples were maintained, saying:

> The fact that the *sealed* ampoules are delivered by the manufacturer of the breathalyzer machine for exclusive use in such machine plus the additional fact of regular spot checking of the ampoules is, in our opinion, sufficient *prima facie* proof that the chemicals in any one ampoule are of the proper kind and mixed to the proper proportion.

(Emphasis in original.) We, likewise, would agree that if testimony such as that suggested by the Washington Supreme Court had been given in this case, it would have supplied sufficient foundation concerning the NALCO standard. Our reading of cases which have considered similar problems with regard to adequate foundation discloses that certain basic facts should be established before an objection as to the foundation for the test may be overruled.

Assuming but not deciding that accurate results can be obtained with a Breathalyzer test, we now adopt those rules for our own jurisdiction and determine that before the State may offer in evidence the results of a breath test for the purpose of establishing that a defendant was at a particular time operating a motor vehicle while having ten-hundredths of one percent or more by weight of alcohol in his body fluid, the State must prove the following: (1) That the testing device or equipment was in proper working order at the time of conducting the test; (2) That the person giving and interpreting the test was properly qualified and held a valid permit issued by the

Nebraska Department of Health at the time of conducting the test; (3) That the test was properly conducted in accordance with a method currently approved by the Nebraska Department of Health; and (4) That there was compliance with any statutory requirements. Essentially the same requirements are prescribed in *Jones v. City of Forrest City,* 239 Ark. 211, 388 S.W.2d 386 (1965); *State v. Quinn,* 289 Minn. 184, 182 N.W.2d 843 (1971); *Otte v. State, supra; State v. Miller,* 64 N.J. Super. 262, 165 A.2d 829 (1960); *People v. Donaldson,* 36 App. Div. 2d 37, 319 N.Y.S.2d 172 (1971); *State v. Sickles,* 25 Ohio App. 2d 1, 265 N.E.2d 787 (1970); *Pruitt v. State,* 216 Tenn. 686, 393 S.W.2d 747 (1965); *State v. Magoon,* 128 Vt. 363, 264 A.2d 779 (1970); *State v. Baker, supra;* Slough & Wilson, *Alcohol and the Motorist: Practical and Legal Problems of Chemical Testing,* 44 Minn. L. Rev. 673 (1960).

To the extent that our decision in this case is contrary to our holding in *State v. Jablonski,* 199 Neb. 341, 258 N.W.2d 918 (1977), that case is overruled.

While perhaps not necessary to our decision, we nevertheless observe that the reliability of Breathalyzer test results is dependent on two basic assumptions: (1) That there is a direct correlation between alcohol content of air in the lungs and alcohol in the blood; and (2) That this relationship is equally true for all people. The first assumption may be true, but the measurement is subject to immense error due to such factors as the absence of recent vomiting or even burping and the cleanliness of the mouth, to name only a few. It is the second assumption, however, that is most fallacious. The scientific literature establishes that the correlative factor used is simply a mean or average. Significant percentages of persons would have alcohol content in the blood above or below the amount indicated by the Breathalyzer result. In a significant number of cases, where the measurement is at the

minimum to establish illegality, persons can be convicted wrongly.

While not raised in this appeal and therefore not now decided, many commentators have suggested that Breathalyzers should be limited to a corroborative role in the prosecution of the offense of driving while intoxicated. The use of a test which can, standing alone, result in conviction of a crime, when the test results can and do differ from individual to individual, offends our sense of justice and fair play.

In this case, the State failed to meet its burden and failed to produce prima facie evidence that the necessary requirements had been met. Therefore, the test was not admissible in evidence. Absent the test, there was no evidence that Gerber had violated the law as charged. The court should have dismissed the complaint and, accordingly, we now order the complaint dismissed.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.

BOSLAUGH, J., dissenting in part.

Testimony by the examining officer that he possessed a valid permit, accompanied by production of a permit regular on its face, should be sufficient to establish, prima facie, the authority of the officer to perform the test under the statute.